[No. A028565. First Dist., Div. Three. Mar. 28, 1986.]

CITY OF OAKLAND ex rel. BOARD OF PORT COMMISSIONERS, Plaintiff and Appellant, v.
UNITED PUBLIC EMPLOYEES, LOCAL 390, SEIU, AFL-CIO, Defendant and Respondent.

Counsel

Stanley P. Hebert and James E. Allen, Jr., for Plaintiff and Appellant.

W. Daniel Boone and Van Bourg, Weinberg, Roger & Rosenfeld for Defendant and Respondent.

Opinion

**MERRILL, J.**—The City of Oakland (City), acting by and through its Board of Port Commissioners, appeals from a judgment confirming an award made in a labor arbitration proceeding between appellant and respondent United Public Employees. We affirm.

For several years, appellant, through the Port of Oakland (the Port), provided an airline information and reservation service at the Oakland International Airport known as "Fly Oakland." Under this program, Port employees responded to telephone inquiries from the general public for flight information and airline reservations; information was given out, and requests for reservations were forwarded to the individual airlines, which then issued tickets and received payments therefor. In or about June or July 1981, the Port management decided to discontinue the "Fly Oakland" service for budgetary reasons. On August 17, 1982, the Port terminated the service, effective August 31, 1982. Simultaneously, it entered into a lease agreement with a private travel agency to operate at the Oakland Airport as

the "Fly Oakland Travel Service." This private travel agency was "full service," unlike the former Port-operated "Fly Oakland" service; that is, it provided and arranged for airline, rail, car, hotel, ship and tour reservations, wrote and issued travel tickets, and collected payment on behalf of carriers.

Eleven employees of the Port-operated "Fly Oakland" service were affected by the Port's decision to terminate it. Four reservation clerks, in positions classified as competitive civil service, were transferred to similar telephone operator positions, at the same rate of pay, elsewhere at the Port. Seven relief reservation clerks were given notices of layoff.[1] Each of these employees was offered and accepted a position with the private travel agency. Prior to and in anticipation of layoff, the latter employees received specialized airline computer and travel agent training from outside consultants at the Port's expense.

On July 6, 1982, respondent filed a grievance regarding the Port's discontinuation of the "Fly Oakland" service. The grievance alleged that the Port's intended service discontinuance and announcement thereof were in violation of the city charter, Civil Service Rules of the City of Oakland, and the memorandum of understanding (MOU) between respondent and the Port. Respondent requested that the Port "remove and rescind" the announcement of its intention to discontinue its operation of the "Fly Oakland" service posted in the June 30, 1982, edition of the Oakland Tribune; "cease, desist and refrain from altering, amending or eliminating the present status of 'Fly Oakland' within the Port"; and make all affected employees aware, through respondent, "of any and all intended actions by the Port . . . relative to their employment at 'Fly Oakland.'" No other relief was sought.

By letter dated July 12, 1982, the Port denied the grievance. It stated that it had kept respondent informed of its plans to discontinue the operation of "Fly Oakland" for over a year; that the Port's "Fly Oakland" service was being discontinued because its benefits were outweighed by the high costs involved; that the new private travel agency had only become a possibility because of recent changes in federal regulations unrelated to the Port's decision to discontinue the service; and that all affected employees would be provided with all layoff rights set forth in the MOU and applicable City and Port rules and regulations.

---

[1]The civil service status of these employees was in dispute in the arbitration. Respondent's position was that they were permanent civil service employees entitled to protection under the city charter. The Port argued that the seven relief reservation positions were exempt from competitive civil service, and that those clerks were therefore not permanent civil service employees.

Subsequently, respondent submitted the matter to arbitration. The arbitration took place on December 13 and 20, 1983, before an arbitrator selected in accordance with the MOU. The parties stipulated that the issue to be decided was as follows: "Whether the Port of Oakland violated the [MOU], the City or Port Civil Service Rules, and/or the Charter of the City of Oakland in its discontinuation of the Port of Oakland's 'Fly Oakland' program during 1982; and, if so, what is the appropriate remedy." The specific sections of the MOU at issue were as follows: article 33, section 3, requiring the Port to give timely notice to respondent of any plans to reduce personnel; article 34, requiring that the Port give advance notice of any contracting of services which might result in the loss of employment or salary by represented employees; and article 38, requiring that "[a]ny changes in wages, hours or terms and conditions of employment beyond those set forth [in the MOU] are subject to the requirements of meeting and conferring in good faith in accordance with the Meyers-Milias-Brown Act as amended."

Following two days of hearings on December 13 and 20, 1983, the arbitrator issued an award finding that the Port "did violate the [MOU] by discontinuing the 'Fly Oakland' telephone reservation service as a Port operation on August 16, 1982, and then replacing it with an expanded travel service operation run by a privately held concessionaire without meeting and conferring with [respondent] as required by the [MOU]." The award required the Port to make a written offer to meet and confer with respondent within 20 calendar days "about its decision to discontinue and replace the 'Fly Oakland' reservation service"; to "make whole" all employees laid off or transferred from the former "Fly Oakland" service as of August 31, 1982, for any losses in wages, benefits or seniority; to make respondent whole for any dues money lost as a result of the discontinuance of the "Fly Oakland" service; not to declare a genuine impasse in the meet and confer process "before three meet and confer sessions shall have taken place without an agreement, nor before all impasse procedures mandated by applicable laws and regulations shall have been followed and exhausted"; and to "make available to [respondent] all payroll records or other records necessary to compute the amounts owed" the employees and respondent under the award. The award was expressly based on the findings set forth in the arbitrator's written opinion. In the opinion, the arbitrator found that there was no violation of article 34 of the MOU or of city charter section 8.02(e) because the Port did not "contract out" work when it discontinued the "Fly Oakland" program and entered into the lease agreement with the travel agency; that the issue of whether the affected clerks were permanent civil service employees or exempt was therefore moot; and that the Port did not violate the provisions of article 33, section 3 of the MOU because there was no reduction in workforce.

These particular findings were based primarily on the arbitrator's key determination that the Port never really terminated its "Fly Oakland" service; rather, it merely continued that service in the form of the travel agency concession. Reasoning from certain provisions in the lease agreement between the Port and the private travel agency retaining for the Port a substantial amount of control over the operations of the travel agency, the arbitrator concluded that "Fly Oakland Travel Service has no independent existence of its own, but is a creature of the Port, created primarily to fulfill the Port's twin policy goals of increasing patronage at the Oakland Airport and increasing minority participation in Port generated business. In almost every area where labor relations questions may arise at Fly Oakland Travel Service—staffing, training, hours, equipment, hiring, affirmative action, or residency requirements—the Port retains substantial authority. [¶] The characterization in the 'Agreement and Lease' of the relationship between the Port and Fly Oakland Travel Service as one of 'ownerconcessionaire' is fairly accurate. It is in precisely this sort of relationship that labor relations authorities such as the NLRB have found that a co-employer or a single employer situation exists, where the owner has retained substantial authority over labor relations. [Citation.] In the present case, the owner even retains substantial authority over the stock ownership of the concessionaire. . . . [¶] In view of the foregoing, then, I find that the Port continues, at a minimum, to be a co-employer of the employees of Fly Oakland Travel Service and that unilateral changes were made in the wages, hours of employment, and working conditions of 'Fly Oakland' program employees."

On the basis of this finding that the Port's action constituted a change in the nature of its "Fly Oakland" operation rather than a discontinuation or termination thereof, the arbitrator went on to consider the meet and confer requirements of article 38 of the MOU.[2] Because unilateral changes were made in the wages, hours, terms and conditions of employment of the "Fly Oakland" employees when the "Fly Oakland" service was transferred from the Port to the private concessionaire, the arbitrator concluded that the meet and confer requirements of article 38 of the MOU were applicable. He found that despite some initial discussions with the Union over the fate of the "Fly Oakland" program, in the early part of 1982 the Port unilaterally decided that it was not a meet and confer issue and refused to give the union any information until the change was announced as a *"fait accompli"* in June 1982; and he concluded that the Port had therefore failed in its obligation to meet and confer. In fashioning a remedy to effectuate the award, the arbitrator required the Port, among other things, to provide respondent

---

[2]That provision states: "It is understood and agreed that the [MOU] constitutes the entire agreement between the parties. Any changes in wages, hours or terms and conditions of employment beyond those set forth herein are subject to the requirements of meeting and conferring in good faith in accordance with the Meyers-Milias-Brown Act, as amended."

with the payroll and time records of all nonsupervisory Fly Oakland Travel Service employees from September 1, 1982, until either an agreement was reached with respondent or an impasse occurred.

Appellant filed its petition to vacate the arbitration award on April 2, 1984. The trial court denied appellant's petition to vacate and granted respondent's cross-petition to confirm. This appeal followed.

Appellant contends that the arbitrator's award was based on his determination that the Port was a "co-employer" with the Fly Oakland Travel Service; that this determination was of an issue not placed in arbitration by the parties; that the arbitrator thereby exceeded his powers; that "the award cannot be corrected without affecting the merits of the decision upon the controversy submitted"; and that the trial court erred in refusing to vacate the arbitrator's award pursuant to Code of Civil Procedure section 1286.2. In support of this argument, appellant points out that the stipulated issue before the arbitrator was whether the Port violated the MOU, applicable civil service rules, or the Oakland City Charter "in its discontinuation" of the Port's "Fly Oakland" program, "and, if so, what is the appropriate remedy." Appellant urges that this stipulation cannot be reconciled with the arbitrator's determination that the Port was a coemployer with the private travel agency. In short, appellant argues that "[t]he issue presented was whether *termination* of the 'Fly Oakland' program violated any of the three sections of the [MOU] and the City Charter . . . . The Arbitrator had no authority to determine that 'Fly Oakland' was not terminated and issue an award on that basis."

The legal principles applicable to this appeal delimit an exceedingly narrow scope for our review of the arbitrator's award. The Legislature has specifically limited the grounds for vacating an arbitration award to those enumerated in Code of Civil Procedure section 1286.2. In view of the strong public policy in favor of arbitration as a means of resolving disputes, the courts have consistently limited judicial interference to the minimum consistent with due process, fundamental fairness, and applicable statutory law in order to promote as much as possible the finality and conclusiveness of awards in arbitration. (*Lindholm* v. *Galvin* (1979) 95 Cal.App.3d 443, 450-451 [157 Cal.Rptr. 167].)

The merits of a controversy in arbitration are not open for judicial review. The findings of an arbitrator on questions of law as well as questions of fact are final and conclusive. It is not appropriate for courts to review the sufficiency of the evidence to support the arbitrator's award or to pass upon the validity of the arbitrator's reasoning; a court simply may not substitute its judgment for that of an arbitrator. (*Morris* v. *Zuckerman* (1968) 69

Cal.2d 686, 691 [72 Cal.Rptr. 880, 446 P.2d 1000]; *Rodrigues* v. *Keller* (1980) 113 Cal.App.3d 838, 843 [170 Cal.Rptr. 349]; *Safeway Stores, Inc.* v. *Brotherhood of Teamsters* (1978) 83 Cal.App.3d 430, 436-437 [147 Cal.Rptr. 835].)

■ An arbitrator may expressly or impliedly reject a claim that a party might successfully have asserted in a judicial action. (*Lindholm* v. *Galvin, supra,* 95 Cal.App.3d at p. 450; *Sapp* v. *Barenfeld* (1949) 34 Cal.2d 515, 523 [212 P.2d 233].) ■ An award will not be set aside merely because the arbitrator erred in finding the facts or applying the law. A court must enforce an arbitrator's award even if it conflicts with substantive law, so long as it is authorized by the arbitration agreement. (*Safeway Stores, Inc.* v. *Brotherhood of Teamsters, supra,* 83 Cal.App.3d at p. 437; *Pacific Automobile Ins. Co.* v. *Lang* (1968) 265 Cal.App.2d 837, 841 [71 Cal.Rptr. 637], disapproved on other grounds in *Orpustan* v. *State Farm Mut. Auto. Ins. Co.* (1972) 7 Cal.3d 988, 992 [103 Cal.Rptr. 919, 500 P.2d 1119].) Neither will errors in reasoning invalidate an otherwise proper award. Every intendment of validity must be given the award and doubts must be resolved in its favor. (*Safeway Stores, Inc.* v. *Brotherhood of Teamsters, supra,* 83 Cal.App.3d at p. 437; *American & Nat. etc. Baseball Clubs* v. *Major League Baseball Players Assn.* (1976) 59 Cal.App.3d 493, 498 [130 Cal.Rptr. 626].) "'A mere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award. Arbitrators have no obligation to the court to give their reasons for an award.' [Citation.] '[I]t is the award, rather than the specific reasoning employed that a court must review.' [Citation.] [¶] . . . 'A court must affirm an arbitrator's award if it "can in any rational way be derived from the agreement," [citation] and can only reverse if "there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop." [Citation.]' [Citation.]" (*Safeway Stores, Inc.* v. *Brotherhood of Teamsters, supra,* 83 Cal.App.3d at p. 437; see also *Foreman Roofing Inc.* v. *United Union of Roofers etc. Workers* (1983) 144 Cal.App.3d 99, 106 [192 Cal.Rptr. 439]; *Department Store Employees Union* v. *Joseph Magnin Co.* (1981) 123 Cal.App.3d 410, 416-417 [176 Cal.Rptr. 650].)

■ We conclude that there was no error on the part of the court below in refusing to vacate the award in arbitration. The arbitrator's award and the opinion upon which it was based addressed the issues to which the parties stipulated. The arbitrator was asked by the parties to decide if the Port had violated the meet and confer provisions contained in article 38 of the MOU in its "discontinuation" of its "Fly Oakland" service; the parties also stipulated that the arbitrator was to determine the appropriate remedy in case it decided there had been such a violation. The stipulation of the

parties *required* the arbitrator to determine whether the discontinuation of the Port's "Fly Oakland" service resulted in a change in the affected employees' wages, hours, or terms and conditions of employment, since these were the circumstances that, under both article 38 of the MOU and applicable state statute, would trigger the requirement of meeting and conferring in good faith. The arbitrator reasoned that "[s]ubsumed under this question is the question of the precise nature of the entity created when the Port discontinued the 'Fly Oakland' program and entered the 'Agreement and Lease' with Fly Oakland Travel Service." He analyzed the provisions of the agreement between the Port and the private concessionaire creating the Fly Oakland Travel Service, and concluded that because the latter was not truly independent of the Port, the Port therefore remained a coemployer with the travel agency. The arbitrator then found that there had been a change in the employees' wages, hours, terms and conditions of employment triggering the meet and confer requirement.

■ Section 1283.4 of the Code of Civil Procedure provides that an arbitration "award shall be in writing and signed by the arbitrators concurring therein. It shall include a determination of *all the questions submitted to the arbitrators the decision of which is necessary in order to determine the controversy.*" (Italics added.) It is for the arbitrator to determine which issues are actually "necessary" to the ultimate decision. (*Morris* v. *Zuckerman, supra,* 69 Cal.2d at p. 690.) Any doubts as to the meaning or extent of an agreement to submit a question or questions to arbitration are for the arbitrator and not the courts to resolve. (*Ibid.; O'Malley* v. *Wilshire Oil Co.* (1963) 59 Cal.2d 482, 490-491 [30 Cal.Rptr. 452, 381 P.2d 188].) Thus, the construction of both the MOU and the parties' agreement to arbitrate was a question of law for the arbitrator. The fact that a different construction was possible does not empower a court to vacate the award.
■ The parties had bargained for and stipulated that the construction would be determined by the arbitrator; "'the courts have no business overruling him because their interpretation of the contract is different from his.' [Citation.]" (*Safeway Stores, Inc.* v. *Brotherhood of Teamsters, supra,* 83 Cal.App.3d at p. 438.)

We conclude that to hold that the arbitrator in this case was without power to consider the nature of the agreement between the Port and the private concessionaire, its relation to the Port's discontinuance of its "Fly Oakland" service, and its effect on the employees discharged by the Port and rehired by the concessionaire, would be a limited and unwarranted interpretation of the parties' agreement stipulating the submission of issues to arbitration. The controversy submitted clearly involved the effect of the Port's action with regard to the "Fly Oakland" service, including its arrangement with the concessionaire. The parties submitted the agreement

between the Port and the concessionaire in evidence as a joint exhibit and offered testimony and argument regarding the relationship between the Port and the travel agency. The arbitrator's determination of the questions presented by the parties' stipulation of issues and his construction of the MOU were not irrational or unreasonable. He reviewed the circumstances surrounding the discontinuation of the Port's "Fly Oakland" service and the creation of the private concessionaire's Fly Oakland Travel Service, and he concluded that the Port was a coemployer with the concessionaire. "The arbitrator could not be said to have exceeded his powers in thus determining a question which he was required to decide in order to resolve the controversy." (*Safeway Stores, Inc.* v. *Brotherhood of Teamsters, supra,* 83 Cal.App.3d at p. 439.)

With regard to the issue of the coemployer status of the Port, we may not substitute our judgment for that of the arbitrator, which is "final and conclusive" on questions of law as well as questions of fact. (*Id.,* at p. 437.) "Courts may not examine the merits of the controversy, the sufficiency of the evidence supporting the award, or the reasoning supporting the decision. [Citation.]" (*Santa Clara-San Benito etc. Elec. Contractors' Assn.* v. *Local Union No. 332* (1974) 40 Cal.App.3d 431, 437 [114 Cal.Rptr. 909].) In light of the strong public policy in favor of upholding arbitration awards and the principles cited above, we can find no basis here for concluding that the arbitrator exceeded his jurisdiction in determining that the Port's disposition of the "Fly Oakland" service was in violation of applicable meet and confer requirements.[3]

■ Appellant also challenges the remedy provided by the arbitrator's award, arguing that it was in excess of the arbitrator's authority. However, the parties stipulated that the arbitrator was to fashion an appropriate remedy in the event he determined that the Port was in violation of the applicable provisions of the MOU, civil service rules, or Oakland City Charter. Counsel for appellant expressly stipulated on the record in the course of the hearing that "in the event the arbitrator issues an award which calls for a remedy to be awarded either to the union or to individual employees, that the arbitrator retain jurisdiction for the purpose of resolving any disputes or differences between the parties in the implementation of that award." We conclude that the remedy set forth in the arbitrator's award was within the

---

[3]Appellant has requested that we take judicial notice of a Port ordinance and four Port resolutions dealing with the Port's policies and procedures with regard to tenants and businesses leasing or operating on Port property, including implementation of the City of Oakland's affirmative action policies in employment. We deferred ruling on this request pending consideration of this appeal. We have now granted the request to take judicial notice; however, in view of the fact that we cannot review the merits of the arbitrator's decision, this additional material has had no effect on our determination of this appeal.

jurisdiction conferred on him by the parties, and that any requests for clarification or challenges to the specific provisions thereof must be addressed to the arbitrator under the terms of the parties' stipulation vesting him with the authority to resolve any disputes regarding the implementation of the award.

Respondent asks us to award it attorney's fees and penalties on the grounds that the appeal is purportedly frivolous and taken solely for the purpose of delay. Although we have determined that the appeal is not meritorious, we do not conclude that it was frivolous. We therefore deny respondent's request.

The judgment confirming the award in arbitration is affirmed.

White, P. J., and Barry-Deal, J., concurred.

A petition for a rehearing was denied April 18, 1986, and appellant's petition for review by the Supreme Court was denied July 23, 1986.